IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEPHEN STERN,

        Plaintiff,

                                   Case No. C2-05-907
vs.                             Judge Edmund A. Sargus, Jr.
                                   Magistrate Judge Mark R. Abel

BRYAN H. FELMET,
        et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of the parties' cross-motions for summary judgment. Plaintiff, Stephen Stern, former Jefferson County Prosecuting Attorney, brings this action against Defendants, Bryan Felment, the Jefferson County Prosecuting Attorney who defeated Plaintiff in 2000 following his bid for re-election to the seat; Jefferson County Commissioners Adam Scurti, Richard Delatore, Thomas Graham (2004) and David Maple (2005); D. Michael Crites, appointed as a Special Prosecuting Attorney; and private citizen Gary Smith as well as his company, Argo Sales Co. ("Argo Sales").[1] Plaintiff asserts, *inter alia*, that Defendants defamed him, invaded his privacy, tortiously interfered with his ability to contract with a state agency for pension retirement benefits, and violated his constitutional rights. Defendants Felmet, Scurti, Delator, Graham, Maple and Crites' ("County Defendants") motion for summary judgment is **GRANTED**; and Plaintiff's motion for summary judgment on the claims asserted against the County Defendants is **DENIED**.

---

[1] The Court addresses Mr. Smith and Argo Sales' motion for summary judgment and Plaintiff's cross-motion against them by separate Opinion and Order.

**I.**

Plaintiff, Stephen Stern, was the former Prosecutor for Jefferson County, Ohio, serving in this capacity from 1980 through June of 2000. In June, 2000, Stern was involved in a serious bicycling accident and suffered debilitating and permanent injuries, including severe head trauma. In November, 2000, Stern sought disability retirement through the Ohio Public Employee Retirement System ("PERS"). PERS awarded Stern a disability pension in March, 2001.

Prior to becoming Jefferson County Prosecutor, Stern alleges that he worked in several public capacities, including that of special counsel or advisor to the Board of Commissioners under a grant awarded to Jefferson County between the years 1973 and 1980. During his convalescence period following his injuries, Stern had been accumulating as much documentation as possible relating to his prior service. Stern had difficulty obtaining these older documents because this service had occurred in the 1970s.

In November, 2000, Stern appeared at Jefferson County Auditor Patrick Marshall's office and asked Marshall to certify Stern's prior years of public service to PERS. According to Marshall, he fanned through, but did not examine any particular document that Stern carried with him to the meeting. Nonetheless, Marshall signed and certified Stern's prior public service to PERS. (Marshall Tr. 64, 79, 98; Dep. Exhs. 8, 17, 21, 22, 82). Marshall considered Stern his legal representative and trusted Stern. According to Marshall, he believed Stern's assurances that he would provide copies of the documents that were necessary to back-up the claim of additional public service. To this date, Stern has not provided any such documentation to Marshall or other official.

After Marshall's initial certification to PERS, the agency wrote back to Marshall on December 15, 2000, seeking additional information. (Dep. Ex. 14). Stern presented Marshall with

-2-

correspondence for his signature to forward to PERS, which Marshall executed and faxed to PERS from the Auditor's office on December 19, 2000. (Dep. Ex. 82). Based upon Marshall's certification, on December 29, 2000, PERS adjusted Stern's service credit to reflect an addition 7.22 years service from 1964-1980. (Dep. Ex. 101).[2] Stern eventually received a disability pension from PERS, which did not ultimately depend on these additional years of service. At the time the additional 7.22 years of service were added, Stern had applied for disability retirement, but had not yet been determined disabled. Had he not been eligible, he would have been entitled to a pension from PERS, the amount of which would be determined in significant part on the number of years of credited public service. Jefferson County, however, paid over $7,000 for these additional years of service. Stern's pension has never been reduced or in any way impacted by the matters that are the subject of the instant litigation.

Stern moved to Florida shortly after the election in 2000, and has continued to reside in that state. He remains a licensed attorney in the State of Ohio on inactive status.

This case finds its roots in the animosity between Stern and Gary Smith, a Jefferson County businessman. Smith has a prior conviction for mining without appropriate permits and was a target of "multiple credible investigations" into his various activities by Stern's office while Stern was Prosecutor. *Ohio State Bar Ass'n v. Stern*, 103 Ohio St.3d 491, 817 N.E.2d 14 (Ohio 2004). For years, Smith accused Stern of ethical misconduct and leveled charges against Stern that he was using his office as Prosecutor to pursue personal vendettas by initiating criminal inquiries against certain subjects, including investigations against Smith. To put it mildly, Smith and Stern share a mutual

---

[2]     Patrick Marshall subsequently attempted to withdraw his certification because of Stern's failure to provide supporting documentation. PERS did not take action upon Marshall's request.

antagonism, and their history in Jefferson County is as much long as it is "tortured." *Id.* at 492.

In 2000, the Ohio Supreme Court Office of Disciplinary Counsel ("ODC") began investigating allegations against Stern brought by Mary Smith regarding her claim that Stern was inappropriately conducting criminal investigations against her husband, Defendant-herein, Gary Smith. At that time, the Smiths actively supported Stern's political opponent, Defendant-herein Bryan Felmet, for the office of County Prosecutor.

During the probe into Mrs. Smith's grievance, two investigators from the ODC met with Stern. Early in that meeting, one of the investigators inquired as to whether Stern was videotaping the conversation. Stern denied that any taping was occurring. The ODC later learned that the meeting had been videotaped when Bryan Felmet, Plaintiff's successor as prosecutor, discovered the tape at the office, and gave it to his attorneys who delivered it to the ODC.

As a result, the ODC filed another grievance against Stern. By opinion dated November 3, 2004, the Ohio Supreme Court found that, "[w]ere it not for additional extenuating circumstances, we would be inclined to find that [Stern] violated DR 1-102(A)(4) [forbidding conduct involving dishonesty, fraud, deceit, or misrepresentation]." *Stern*, 103 Ohio St. 3d at 496. Based on the totality of the circumstances, however, the Supreme Court declined to impose discipline.[3] The Court acknowledged that,

---

[3]    To reach their conclusion, the Court relied on several "extenuating factors," including the fact that Stern believed the grievance was politically motivated by the Smiths, who appeared to be using the process against Stern to curtail his criminal investigations, and because Stern had previously endured several disingenuous disciplinary investigations 20 years earlier which led him to be suspicious of the ODC. The Court also found Stern's head injury to be fundamental in their considerations, because, as they found, "[t]here is no way of knowing how much the head injury influenced the events that occurred, but our full review of the record convinces us that its effect was significant." *Stern*, 103 Ohio St. 3d at 498.

-4-

reasonable minds can differ in how this case is viewed and that, on a fundamental level, there is understandable apprehension about allowing respondent to escape discipline for what can only be characterized as lying to ODC investigators. We are not totally comfortable with establishing a precedent that seems to accept that telling such a lie is tolerable. Nevertheless, after thoroughly considering the salient details, we find that dismissal of the charge is warranted. We caution explicitly that our determination is based on the unique circumstances of this case and is limited exclusively to this situation.

*Id.*[4]

In March, 2004, Gary Smith began a personal investigation into to Stern's prior service credit. Smith sent a letter to County Auditor, Patrick Marshall, regarding back payments for PERS service to Stern. In April, 2004, Smith retained John Mascio, a local attorney, to investigate Stern's prior PERS public service. Mascio examined records, including prior Board of County Commissioners' meeting minutes and interviewed Marshall about Stern's prior service. On April 24, 2004, Mascio wrote Smith a letter in which he stated that he could not find records to substantiate Stern's representation to the Auditor of his prior years of service.

On July 15, 2004, Smith appeared at the Jefferson County Commissioners meeting, which was open to the public pursuant to Ohio Rev. Code § 305.09.[5] Smith reported his concerns to the

---

[4] Three Justices dissented, finding that "[w]e should be concerned that we have set a precedent that says that if a lawyer believes a complaint has been filed against him or her for politically motivated reasons, the lawyer is justified in expressly misrepresenting an important fact to those we have entrusted to investigate the complaint." *Stern*, 130 Ohio St. 3d at 500-01 (Moyer, C.J., dissenting). The dissenters emphasized that "[s]uch situational ethics have no place in a lawyer discipline system." *Id.*

[5] Because many of the allegations in Stern's Complaint relate to the statements made at the meeting, the Court sets forth the following extended transcript of the July 15, 2004 proceedings:

MR. GARY SMITH – I'm Gary Smith and I'm from Wintersville, Ohio. I've been looking into some misappropriation of County funds. At least that I believe they are. On March 26th, I asked the County Auditor's Office for some information on Stephen Stern, and they didn't have anything. And the second part of this is where you can see is that Pat Marshall is sending a letter, or Stephen Stern's sending a letter to Pat Marshall saying that he worked for the County from 1974 up until 1980. And then the next letter is Mr. Marshall sending the State Auditor, or the Auditor people in

-5-

Columbus a deal where he says they do not have any backup on anything. But they were taking Steve's word for it.

On January 2, 2001, the Auditor sent people seven thousand seventy nine dollars and forty six cents ($7,079.46) to pay for Steve's PERS.

And the I hired John Mascio, J.J., to do a check on this. And the letter's in there that J.J., could find nowhere that Steven was employed during this length of time. And the last letter is where J.J., sent a letter to Pat Marshall to memorialize and confirm the conversation they had and if there was anything different in the deal to send it to him. And J.J. has never received anything.

So therefore, I would have to say that everything there is just on Steve Stern's word. And maybe I'd like to go up to the County Auditor's Office and say that I worked here for twenty (20) years and I can get my PERS also, if that's the way you're going to work this.

COMMISSIONER RICHARD DELATORE – So your complaint to us, or your recommendation to us is that?

MR. SMITH – I think we need to hire a special prosecutor, or give it to the Prosecutor and have this all checked. And if there is no information on this. And if Steven Stern does not have any hard evidence where he worked for the County. It looks like to me that Mr. Stern committed fraud when he was in public office. And it looks like Pat Marshall has theft of County funds by issuing this with no hard evidence, unless everybody else in the County wants to get the same amount of money.

COMMISSIONER THOMAS E. GRAHAM – I think, Mr. Smith, that this – I'm only speaking for myself. It should be turned over to the Prosecutor's Office, and then go with his recommendation, or their recommendation on how to proceed on this matter. If they can't handle it that will have to be the stated to us by them. If they can then we have to go with whatever their recommendation is.

MR. SMITH – I think you need a special prosecutor one way or the other.

COMMISSIONER GRAHAM – we have to hear from him first.

MR. SMITH – Whether he has to do that, or whatever, that's what I'd like to see done.

COMMISSIONER DELATORE – I believe the Prosecutor has turned this actually down as far as being able to represent the County. And then he will tell a Judge. And that Judge will make a decision to hire a special prosecutor. I think, Commissioner Scurti, is that the way you do it?

COMMISSIONER SCURTI – Whether or not our present Prosecutor, Mr. Felmet would wish to be involved or not. It will be his decision. I believe that he most likely would prefer and suggest that we have a special prosecutor. But I do think that we can get through that step.

I also would suggest, knowing that Mr. Smith was going to be making this request. I asked our staff in the Commissioners Office to determine if anything appears in our journals. And the journal of the Commissioners is the record of the actions that we have taken. And during the period of time wherein there's a point that Mr. Stern performed services from 1974 through 1980. It is my understanding from the staff, and that is subject to further research, finds no indication of any activity by Mr. Stern on behalf of the Commissioners Office. The records will speak for

themselves. But that's the understanding that I have from our staff here.

MR. SMITH – But I'd like to see this go a little bit further. Because I think that if this was done here I'm sure it was done in the past on other people in this County. It seems like we have a good old boy network that likes to take care of our own. I'd just like to have it done all of the way through. I think the investigation ought to entail the whole office up there and see what went on.

COMMISSIONER SCURTI – Mr. Smith, it is not the obligation or desire of this Commission to be the entity that tries to designate another elected official to be investigated. That is not what this Commission is supposed to do, that is the Prosecutor.

MR. SMITH – But your Commission – but your job is to watch our money, right?

COMMISSIONER SCURTI - I think our job is to make decisions on how money is spent. I think it's the Auditor and Treasurer's job to watch our money.

COMMISSIONER DELATORE - Mr. Smith, this request for information from the Jefferson County Auditor's Office.

MR. SMITH - I sent that in to the Auditor's Office.

COMMISSIONER DELATORE - But you got nothing back?

MR. SMITH - Nothing back. That's what I got back right there.

COMMISSIONER DELATORE - It says, see per attached letter.

MR. SMITH - I sent the letter into them. I sent the letter in asking for the information for those dates, and that's all I got back. They told me there wasn't anything there. And then the letter on back, the last letter from Mr. Mascio, or Attorney Mascio, it goes through the whole thing where he asked them for any information and so forth. And Pat Marshall has never responded or anybody in the Auditor's Office has never responded to that also.

COMMISSIONER DELATORE - My recommendation is that this should be placed in the hands of the Prosecutor as Commissioner Scurti and Commissioner Graham recommend. I think that is the right route. And if he feels he wants to handle this, fine. If he doesn't then he can contact the Judge. I think it would be Judge Bruzzese and ask for a special prosecutor.

COMMISSIONER GRAHAM - It wouldn't be in his hands, it would be up to the prosecutor to determine whether they want to do a criminal investigation or not. But I'll make a motion that this information be submitted to the Prosecutor's Office and the decision to be made by them.

COMMISSIONER SCURTI - And I'll second that.

Roll call - Dr. Graham, Yes; Mr. Scurti, Yes; Mr. Delatore, Yes.

COMMISSIONER SCURTI – Just one more question. Have you made an attempt on your own or through your counsel to talk with PERS people in Columbus?

MR. SMITH – Yes I have.

Board that Stern may have received public retirement credit without having earned it. Smith informed the Board that he had hired Mascio to research the matter, who had found nothing to substantiate that Stern had worked for the County from 1974 to 1980. The Commissioners, Defendants Scurti, Delatore and Graham, voted to refer the matter to the Prosecutor's office for a determination of whether to proceed with an investigation. Defendant Bryan Felmet was the Jefferson County Prosecutor at the time.

Stern notes that the transcript of the meeting indicates that Commissioner Scurti was aware that Smith intended to speak at the meeting and the subject matter of his request. Stern suggests that the Commissioners should have stopped Smith from speaking or gone into executive session

On July 20, 2004, the Commissioner Scurti, Delatore and Graham sent a letter to the Jefferson County Prosecuting Attorney, Defendant Felmet, stating that "the information received from Gary Smith during the regular meeting of the Board of Commissioners is accepted as submitted and referred to the Jefferson County Prosecutor's Office and that a decision be made from said Prosecutor's Office on the request." (Dep. Ex. 151). On July 21, 2004, Felmet sent a letter to Judge Bruzzese stating "that based upon information submitted to me by the Board of County

---

COMMISSIONER SCURTI – And have you received a response?

MR. SMITH – Kind of vague response back from them that I didn't know whether they were checking on it or – they really didn't say one way or the other. It was something to the fact that I had no right to check on – that was privileged information on peoples retirement.

COMMISSIONER SCURTI – Are you willing to provide that correspondence to our local prosecutor?

MR. SMITH – Yes I am. I'm willing to give you everything.

COMMISSIONER SCURTI – I would ask that you do that.

MR. SMITH – Thank you very much.

-8-

Commissioners and Gary Smith," he "determined that a Special Prosecutor" was needed to "investigate, evaluate, and possibly prosecute" Stern relating to his PERS prior service credit. (Dep. Ex. 152). Felmet determined that a conflict would exist if he investigated his former political opponent, as he had defeated Stern in the 2000 election.

On July 29, 2004, the Commissioners requested "authority from the Jefferson County Court of Common Pleas to employ D. Michael Crites" as "Special Prosecutor to assist or act in the place of the Prosecuting Attorney" in investigating alleged "misappropriation of funds" by Stern. (Dep. Ex. 153). To assist in the investigation, the Court of Common Pleas approved the appointment of Gary Roundtree as a private investigator. During the course of the investigation, Roundtree conducted thirty-two interviews. Crites issued a grand jury subpoena to PERS to obtain documents relating to Stern's contributions and statements of service.

During this time, Felmet was running for reelection against Thomas Straus. Straus had worked as an Assistant Prosecutor to Stern when he was in office. During the campaign against Straus, Felmet distributed a printed color brochure which had the word "GUILTY" on the front, and the language: "For 20 years, Tom Straus worked side by side with former prosecutor Stephen Stern. And Straus learned a lot. When he lied to the people of Jefferson County, Tom Straus broke our trust – just like Stephen Stern did." (Dep Ex. 103). Felmet testified in his deposition that his statements in the brochure related to Stern's "lying" to the ODC about whether he was taping them during an interview. (Felmet Tr. 111-112).

Crites prepared a detailed report dated April 1,2005, which he addressed to the

Commissioners.[6]  Crites concluded "that there is insufficient evidence to charge Mr. Stern with any misappropriation crimes, including falsification, theft in office, theft by deception, or tampering with records." (Dep. Ex. 35, p. 3).  Crites noted that the public records which would have shown or contradicted whether Stern was employed by the County during the period of 1974 through 1980 no longer existed, if they ever existed, and anyone who would have had personal knowledge of the facts was deceased.  Crites' report was made public.  This lawsuit then ensued.

The following is a list of Counts in Plaintiff's Amended Complaint, and the Defendants against whom he asserts each claim:

**Count I** - defamation of character against Defendants Smith, Scurti, Delatore, Graham, Argo Sales, Crites, and Felmet.

**Count II** - civil conspiracy against all Defendants alleging merely that "[a]ll Defendants various acts and omissions directed towards Plaintiff Stern constitute civil conspiracy." (Amend. Compl., at 83.)

**Count III** - breach of fiduciary duty against Defendant Scurti, Delatore, Maple and Graham, alleging that their various acts in disseminating confidential information about Plaintiff Stern constitute breach of fiduciary duty, and that their omissions in acquiescing, consenting or complicity in the publication of statements they knew or should have known were false or with reckless disregard for the truth constitute breach of fiduciary duty.

**Count IV** - tortious interference with contract against Smith and Argo Sales, alleging that their various acts and omissions directed towards Plaintiff Stern in seeking to interfere with his PERS benefits constitute tortious interference with existing or prospective contract.

**Count V** - intentional infliction of emotional distress against Defendants Smith, Argo Sales, Felmet, Scurti, Delatore, Graham and Crites.

**Count VI** - abuse of process against Defendants Scurti, Graham, Delatore, Crites and

---

[6]        By this time, Defendant David Maple had been elected as a Commissioner to the Board. Maple replaced Commissioner Delatore who had decided not to seek re-election.  Maple did not take office until January, 2005.

Felmet, alleging that their various acts and omissions directed towards Plaintiff Stern in subjecting him to continued formal investigation, prosecution and grand jury proceedings which they knew or should have had no basis in fact or the law or with reckless disregard for the truth constitute abuse of process.

**Count VII** - malicious prosecution against Defendants Scurti, Graham, Delatore, Crites and Felmet for various acts and omissions directed towards Plaintiff Stern in subjecting him to investigation, prosecution and grand jury proceedings which they knew or should have known had no basis in fact or the law or with reckless disregard for the truth and which terminated in the favor of Plaintiff.

**Count VIII** - 42 U.S.C. § 1983 against Defendants-County Commissioners Scurti, Delatore, Maple and Graham, for various acts and omissions directed towards Plaintiff Stern which he alleges "constitute [a] violation of privacy interest and liberty interest as provided under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution . . . ." (Amend. Compl, ¶ 100.)

**Count IX** - invasion of privacy against all Defendants allegedly for obtaining and disseminating matters obtained in violation of the law, which, according to Plaintiff Stern "amounted to the unwarranted or wrongful and intentional intrusion of plaintiff's private affairs in such a manner as to outrage or cause mental suffering . . . ." (Amend. Compl., ¶ 103.)

Plaintiff moves for partial summary judgment as to his defamation claims against Defendants

Gary Smith and Bryan Felmet (Count I); invasion of privacy claims against all Defendants (Count

IX); malicious prosecution claims as to Defendants Crites, Scurti, Graham Delatore, and Felmet

(Count VII); and civil conspiracy claims as to all Defendants (Count II). The County Defendants

move for summary judgment as a matter of law on the merits of each of Plaintiff's claims against

them, and also assert immunity defenses.[7] These motions are now before the Court for final

---

[7]      Defendants Kim Felmet, John Corrigan; the law firm of Rich, Crites, & Dittmer, LLC, Gary Roundtree, and Intellinorth Investigations, Inc., also filed a motion for summary judgment. The Court notes that Plaintiff has abandoned his claims against Defendants Kim Felmet (Bryan Felmet's wife and campaign treasurer), John Corrigan (Jefferson County Clerk of Courts), the law firm of Rich, Crites & Dittmer, LLC (the special prosecutor's law firm), Gary L. Roundtree (the private investigator for the special prosecutor) and Intellinorth Investigations, Inc. (Mr. Roundtree's company).

The Court previously granted Plaintiff leave to amend the complaint. When he did, Plaintiff did

-11-

disposition.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact,

which may be accomplished by demonstrating that the nonmoving party lacks evidence to support

an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart

v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary

judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most

---

not rename these Defendants. Nonetheless, these Defendants now seek judgment, arguing that Plaintiff
Stern may refile against them in the future, even though discovery has closed, and the claims previously
asserted against them are before the Court on the merits. Plaintiff has not opposed the motion or
otherwise objected to the entry of judgment in their favor.

In the Court's view, it has no jurisdiction to enter judgment against these individuals. They are
not now parties to this action. Should Defendants' concerns come to fruition, and Plaintiff would one day
seek to reinstate a case against them, Defendants maintain the right to assert all of their defenses, such as
statute of limitations or *res judicata*. The Court, however, makes no determination here, and this
Opinion should in no way be construed as a legal conclusion on the validity of such potential claims or
defenses.

favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated

record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(citations omitted). The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III.

### A. County Defendants

#### 1. Defendant-Commissioner Maple

Stern has adduced no evidence that Commissioner David Maple committed any tort against him. Commissioner Maple did not take his office until January 2005, five months after the July 15, 2004 meeting of the Board of Commissioners. He was not aware of the investigation against Stern; did not participate in any decision to initiate the investigation; has had no public dealings with Stern; and, based on his deposition testimony, never uttered a word about Stern in his campaign or during office.[8] Maple simply was in office when Mr. Cites issued the report of the Special Prosecutor to the Board of Commissioners on April 1, 2005. Stern, in fact does not mention Maple in his motion for summary judgment or opposition to the County-Defendants' motion. Defendant Maple is, therefore, entitled to judgment as a matter of law.[9]

#### 2. Defendants- Commissioners Scurti , Delatore and Graham

##### a.) 42 U.S.C. § 1983 – Qualified Immunity

Stern's federal civil rights claim against the County Commissioners states merely that their

---

[8] Maple met Stern on one previous occasion several years before he was a County Commissioner when Maple was participating in a private-citizens' group attempting to generate economic development around the region.

[9] Even if Stern had adduced sufficient evidence of Maple's liability, Maple would be entitled to the same immunity as his Co-Commissioners, as set forth below.

various acts and omissions directed towards him "constitute [a] violation of privacy interest and liberty interest as provided under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. . . ." (Amend. Compl., ¶ 100.)[10] Citing *Roe v. Wade*, 410 U.S. 113 (1973) and its progeny, Stern's memorandum in opposition elucidates that his Section 1983 claim is a substantive due process claim, "predicated upon the constitutional right of privacy," which, according to Plaintiff, is inferred from a penumbra of amendments including, in his case, the First, Fourth, Fifth and Fourteenth Amendments.

Stern claims that his right to privacy was violated by "an illegal and unwarranted intrusion into his private life." Relying principally on the case of *Bailey v. City of Port Huron*, 507 F.3d 364 (6th Cir. 2007), Stern characterizes his privacy interest as one of avoiding disclosure of the personal matters contained in his PERS files. Defendants assert that qualified immunity bars this claim against them.

To overcome a claim to qualified immunity, a plaintiff must establish (1) that the defendant violated a "constitutional right" and (2) that the right "was clearly established." *Saucier v. Katz*, 533

---

[10]    The Court notes that Plaintiff's Amended Complaint names each of the County Commissioners "[i]n his official capacity" only. The defense of qualified immunity, of course, is available in *personal* capacity lawsuits. While it is "clearly preferable" that a plaintiff expressly state in the complaint whether a defendant in a § 1983 action is sued in his or her individual capacity, "failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice of an individual capacity claim." *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001). In this case, because Defendants have raised and thoroughly argued the defense of qualified immunity, the Court will presume that these Defendants interpreted Plaintiff's action as being against them personally, and that the course of proceeding indicates that they were aware of Plaintiff's intention to hold them individually liable.

As to any Section 1983 claim Plaintiff intended to assert against the Commissioners in their official capacities, that claim too would fail. Because the Court concludes that Plaintiff has not suffered a constitutional deprivation, which is the quintessential prerequisite for a Section 1983 claim, he cannot prevail on either an individual or official-capacity theory.

U.S. 194, 201 (2001). The Court must address the first question before turning to the merits of the second. *Id.* at 200.

The Fourteenth Amendment guarantees "due process of law" for any deprivation of "life, liberty, or property." U.S. Const. amend. XIV. The Fourteenth Amendment contains within it "a substantive component," *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992), which protects other "fundamental rights and liberties" that are not expressly mentioned in the Bill of Rights but that are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted).

Substantive due process protects two types of privacy rights. It protects an individual's right to make "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Lawrence v. Texas*, 539 U.S. 558, 574 (2003). Further, substantive due process protects an individual's "interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998); *J.P. v. DeSanti*, 653 F.2d 1080, 1088-91 (6th Cir.1981).

Stern predicates his Section 1983 action on the second line of cases, although the exact nature of his substantive due process claim remains ill-defined. To the extent that Stern asserts that an individual who is the subject of an investigation into an alleged misappropriation of funds has a right to prevent the public from obtain access to private information contained in investigatory reports, that claim is foreclosed by *Barber v. Overton*, 496 F.3d 449 (6th Cir. 2007)(declining to establish a

-16-

privacy right in personal information collected during an internal investigation of corrections officers accused of assaulting prisoners, finding that the information did not rise to a constitutionally significant level); *see also Bailey*, 507 F.3d at 368-69 (holding that no constitutional right to privacy exists for a criminal suspect who claimed that the state could not publish personal information contained in a police report).

Plaintiff further contends in support of his substantive due process claim, that Ohio Rev. Code § 145.27 creates a right to privacy in his PERS files and that disclosure of the information contained in them rises to the level of a constitutional violation.[11]

Ohio Rev. Code § 145.27 does state that personal history records and medical records are not open to public inspection. Ohio Rev. Code § 145.27(A)(2). The Court notes that the statute creates an exception for prosecutors to gain access to such records under certain circumstances, which are not applicable here. Ohio Rev. Code § 145.27(D)(1). The statute, however, does not prevent a prosecutor or other law enforcement officials from gaining access to such records for purposes of a criminal investigation.

Furthermore, Stern has not demonstrated that he had a constitutionally protected legitimate expectation of privacy in these records. They were not his records, and they were not seized from his person, house, or any other place under his control. The records are kept by an agency of the

---

[11] The grand jury subpoena requests:

Any and all documents, records and information in the membership file, including but not limited to, address, telephone number, social security number, record of contributions, correspondence with the Public Employees Retirement System, statement of service and other information provided by Section 145.136 of the Revised Code, the amount of the monthly allowance or benefits paid, and the individual's personal history record, in the name of Stephen M. Stern . . . .

(Exh. 208.)

-17-

State of Ohio *related* to Plaintiff's public employment. Considering the public purpose of the grand jury subpoena compelling the information, and the fact that access to this information could not be accomplished through alternative sources,[12] the Court finds that need for disclosure outweighs the relatively modest possibility of harm for invasion of privacy.

Stern additionally contends that the Commissioners violated his constitutional right to privacy when they "allowed" Gary Smith to make statements in public at the July 15, 2004 Board of Commissioners meeting. He relies on Ohio Revised Code §121.22(G) for the proposition that the Board of Commissioners should have gone into executive session to hear Smith's statement regarding Stern. Ohio Revised Code §121.22(G)(1), however, permits the Board of Commissioners to use executive session to address employment decisions on current or prospective employees. Smith's statements had no relation to such matters. Furthermore, Ohio Revised Code §121.22(G) permits, but does not require, executive sessions. Otherwise, § 121.22 requires that meetings of public bodies be held in open session.[13]

Stern seems to assert that he has a generalized right to privacy, and relies on *Whalen v. Roe*, 429 U.S. 589, 599 (1977) and *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977). Although

_____

[12]    Notably, Stern asserts that he has documentation supporting his claim to additional PERS compensation, but has consistently refused to disclose it.

[13]    Stern also contends that a legal opinion he himself authored on September 2, 1998 notified the Board of Commissioners that public meetings should not be used as a venue unsubstantiated attacks. Without commenting on whether Smith's remarks at the July 2004 Board meeting may be considered substantiated or unsubstantiated, the Court does not view this correspondence as relevant to Stern's substantive-due process claim. Stern's letter is merely a list of recommendations to the Board of Commissioners, prepared for them upon their request, following an apparently raucous Board meeting at which hearsay statements were leveled against an unidentified county employee. In addition to suggesting executive session to discuss charges against a public employee, the letter contains such recommendations as implementing Robert's Rules of Parliamentary Procedure. The letter is neither binding on the Board of Commissioners, nor pertinent to Stern's claim under Section 1983.

*Whalen* and *Nixon* recognize a right to nondisclosure of personal information in some settings, both cases rejected the right-to-privacy claim. *See Nixon* (requiring the President to disclose private information): *Whalen* (upholding a state system that records private patient information).[14]

"[T]he Constitution does not encompass a general right to nondisclosure of private information." *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981). "[N]ot all . . . interests in nondisclosure of private information are of a constitutional dimension. . . ." *Id.* at 1091. Stern has failed to demonstrate that Defendants violated a constitutional right so as to defeat Defendants' assertion of qualified immunity.[15]

For these reasons, the County Defendants' Motion for Summary Judgment is **GRANTED** as to Stern's claim under Section 1983.[16]

### b.) State Law Claims

The County-Commissioner Defendants assert that Ohio's Political Subdivision Immunity

---

[14] Stern also cites, without analysis, *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir.1998), in which the Sixth Circuit found that undercover officers had a privacy interest of "constitutional dimension[ ]" against state disclosure of their personnel files to defense counsel for a violent gang. *Id.* at 1063. *Kallstrom* created a narrowly tailored right, limited to circumstances where the private disclosure was particularly sensitive, and the persons to whom it was disclosed were particularly dangerous. *Kallstrom* is clearly distinguishable from this case. *Kallstrom* also involved the disclosure of personal information of the officers, their immediate family members and their personal references, their bank account information and account balances, their social security numbers, their answers to personal questions asked during polygraph examinations and copies of their drivers' licenses to prisoners, all of which put the officers and their families' lives at risk. In *Kallstrom*, the plaintiffs were not being investigated for potential criminal activity and the personal information was given to the lawyers for the criminal defendants; here, the information was delivered in response to a grand jury subpoena.

[15] Because the Court concludes that Plaintiff's federal claim under Section 1983 against the County Commissioners is barred by the application of qualified immunity, it need not conduct the fact-intensive analysis of whether Defendants' conduct is entitled to absolute legislative immunity, as they assert.

[16] Plaintiff did not move for summary judgment on his federal Section 1983 claim.

-19-

Acts grants immunity to all state-law claims against them. Specifically, under Ohio Rev. Code §

2744.02(A), political subdivisions are provided immunity from liability for alleged tortious acts.[17]

Employees of political subdivisions are immune under R.C. § 2744.03(A)(1)-(6). As pertinent here,

Section 2744.03 provides:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
>
>          * * *          * * *          * * *
>
> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
>      (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>      (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . . .

The evidence of record demonstrates that the County-Commissioner Defendants learned of

the allegations against Stern at the Board meeting in July 2004. They referred the matter to the

prosecutor for an investigation and subsequently accepted Special Prosecutor Crites' report. Nothing

in the record shows that they acted outside the scope of their employment or acted maliciously,

wantonly, recklessly or in bad faith. Stern, in fact, does not argue that the Commissioners acted

recklessly or wantonly for purposes of their assertion of sovereign immunity.

---

[17] Ohio Rev. Code § 2744.01(F) defines the term "political subdivision" to include counties. The Court notes that Plaintiff has named the Board members in their official capacities, but not Jefferson County. An action against a government official in his or her official capacity is treated as an action against the governmental entity itself. *Shamaeizadeh v. Cunigan*, 338 F.3d 535 (6th Cir. 2003).

-20-

Stern, however, contends that these Defendants are not entitled to immunity because Ohio Rev. Code § 2744.09(B) excludes application of political subdivision immunities to employment actions.[18]  Section 2744.09 provides in pertinent part: "[c]ivil actions by an employee, or the collective bargaining representative of an employee, against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision . . . ."  Stern maintains that all of his claims in this case "arise[] out of" his employment as Jefferson County as prosecutor.

The Court concludes that Ohio Rev. Code § 2744.09(B) does not bar application of state immunities in this case.  Stern has not brought this action as a civil employee against his political subdivision.  Certainly, he was not employed by the Board of Commissioners.  *See Marcum v. Rice*, Case No. 98AP-717-21, 1999 WL 513813 (Ohio Ct. App. 10th Dist. July 20, 1999) (unpublished)(holding that Chapter 2744 is inapplicable to civil actions brought by employees of political subdivisions against their employers pertaining to terms of employment).  Stern's claims relate to injuries he allegedly sustained to his reputation and privacy interests as a result of the July 2004 Board of Commissioner's meeting and subsequent criminal investigation into matters unrelated to his employment as a prosecutor, long after Stern had left his employment as the Jefferson County Prosecutor.  *See Nungester v. Cincinnati*, 100 Ohio App.3d 561, 566-97 654 N.E.2d 423 (Ohio Ct. App. 1st Dist. 1995)(finding that plaintiff's status as a police officer was of absolutely no legal significance to the state-law claims he asserted against the city because, *inter alia,* all of the rights

---

[18]    Plaintiff also contends that Ohio Rev. Code § 2744.09(E) removes municipality immunities for his Section 1983 claim.  Ohio Rev. Code § 2744.09(E) provides that the Chapter does not apply to "[c]ivil claims based upon alleged violations of the constitution . . . ."  Defendants, however, have not sought application of the state immunities statute to Plaintiff's federal civil rights claim.  They have relied on qualified immunity as grounds to defeat the claim.

-21-

he asserted in his claims of false arrest, malicious prosecution, and the like were purely personal

rights that in no way were created by or dependent upon the existence of his employment relationship

with the city.) Under these circumstances, the Court concludes that Ohio Rev. Code § 2744.09(B)

does not bar application of the political subdivision immunities authorized generally by Ohio Rev.

Code § 2744.02(A)(1).

For these reasons, the County Defendants' motion for summary judgment as to Stern's state-

law claims is **GRANTED**. Plaintiff's motion for summary judgment as to his claims for invasion

of privacy, malicious prosecution and civil conspiracy against these Defendants is accordingly

**DENIED**.

### 3.   Defendant Crites

Defendant, D. Michael Crites, is identified as an Ohio attorney and was appointed a special

prosecutor by the Jefferson County Common Pleas Court on July 30, 2004. Plaintiff has sued

Defendant Crites for several state-law claims: civil conspiracy, intentional infliction of emotional

distress, abuse of process, malicious prosecution and invasion of privacy.[19]  Defendant Crites

contends that he is entitled to prosecutorial immunity. Stern, on the other hand, maintains that Cries

did not follow the proper procedures to make his commission as a special prosecutor effective and,

therefore, he is not entitled to any form of immunity.

---

[19]     Although Defendants and Plaintiff occasionally argue as to Crites' liability and
immunities relative to Plaintiff's Section 1983 claim, the Court notes that Plaintiff's Amended Complaint
does not name Crites in that Count. Moreover, the Court has previously dismissed Plaintiff's Section
1983 claim against Crites. (Opinion and Order, Doc. #130.) Even if Crites were named in Plaintiff's
federal civil rights claim, for all the reasons provided above, with respect to qualified immunity, and
below, with respect to prosecutorial immunity, Crites would be relieved of liability.

-22-

23

Claims against a prosecutor in his or her individual capacity are subject to the protections afforded by prosecutorial immunity. *Willitzer v. McCloud*, 6 Ohio St.3d 447, 449, 453 N.E.2d 693 (1983)(quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).[20]  A prosecutor is shielded with absolute immunity in initiating a prosecution. *Id.* (quoting *Imbler*, 424U.S. at 431); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993).  "[P]rosecutors are considered "quasi-judicial officers" entitled to absolute immunity granted judges, when their activities are 'intimately associated with the judicial phase of the criminal process.'" *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  Absolute immunity allows a prosecutor to exercise his or her independent judgment in "deciding which suits to bring and in conducting them in court" based on a duty to the public rather than on a fear of potential liability in a suit for damages. *Imbler*, 424 U.S. at 424-25.

Absolute prosecutorial immunity, however, does not extend to every act performed by a prosecutor.  To determine when the prosecutor is entitled to absolute immunity, the Supreme Court has adopted "functional approach":

---

[20]      Ohio Revised Code § 2744.03(A)(7) provides that " . . . an employee who is a county prosecuting attorney, city director of law, village solicitor, or similar chief legal officer of a political subdivision, an assistant of any such person, or a judge of a court of this state is entitled to any defense or immunity available at common law or established by the Revised Code." State law on the subject is identical to federal:

> Prosecutors are entitled to absolute immunity when their activities are intimately associated with the judicial phase of the criminal process. Absolute immunity is extended to the prosecutor's functions in initiating a prosecution and presenting the state's case; however, it is not applicable to a prosecutor engaged in investigative or administrative functions.

*Carlton v. Davisson* , 104 Ohio App.3d 636, 650, 662 N.E.2d 1112 (Ohio Ct. App. 6th Dist. 1995)(citations omitted).

> [W]hen a prosecutor functions as an administrator rather than as an officer of
> the court he is entitled only to qualified immunity. There is a difference between the
> advocate's role in evaluating evidence and interviewing witnesses as he prepares for
> trial, on the one hand, and the detective's role in searching for the clues and
> corroboration that might give him probable cause to recommend that a suspect be
> arrested, on the other hand. When a prosecutor performs the investigative functions
> normally performed by a detective or police officer, it is neither appropriate nor
> justifiable that, for the same act, immunity should protect the one and not the other.

*Buckley,* 509 U.S. at 273-74 (internal quotations and citations omitted). "'Functional analysis'

focuses on the role of the prosecutor at the time he engages in the challenged conduct. 'Absolute

prosecutorial immunity is not defeated by a showing that the prosecutor acted wrongfully or even

maliciously, or because the criminal defendant ultimately prevailed . . . .'" *Grant v. Hollenbach,* 870

F.2d 1135, 1138 (6th Cir. 1989)(quoting M. Schwartz & J. Kirklin, Section 1983 Litigation: Claims,

Defenses, and Fees § 7.8 (1986)).

A prosecutor is absolutely immune from suit stemming from his or her decision to investigate

or not to investigate and to present the facts discovered in a judicial proceeding, including

presentment to a grand jury. *Hollenbach,* 870 F.2d at 1139. Stern does not contest that Crites'

decision to investigate the charges is protected by absolute immunity. He maintains, however, that

Crites himself interviewed Marshall "several times," and communicated with the Board of

Commissioners, thus stepping outside of his role as advocate and into the role of investigator, for

which he is not entitled to absolute immunity.[21]

Applying these principles to Crites' actions in this case, the Court concludes that the special

---

[21]     Crites deposition is clear, however, that his investigator, Mr. Roundtree, conducted all of
the interviews, and only communicated his findings to Crites. (Crites Dep. II., at 75.) Crites' report
indicates that Mr. Roundtree conducted thirty-two interviews. (Dep. Exh. 35, 64 at p. 2.) Furthermore,
Crites emphasized that he never spoke about the investigation to Mr. Scurti, the Commissioner to whom
Stern presumably refers, but only provided information such as his estimate of when the investigation
would be complete. (Crites Dep. II, at 62-63, 65.)

prosecutor is entitled to absolute immunity. The evidence indicates that Crites made the decision to investigate, reviewed and coordinated with the investigator and conducted a professional evaluation of evidence. Crites, ultimately, decided not to pursue criminal charges against Stern. These were advocacy functions intimately associated with the judicial phase of the criminal process. That Stern ascribes malicious motives to the Crites as the special prosecutor is of no consequence, because absolute immunity provides complete protection from judicial scrutiny of the motives for the prosecutors' actions. Focusing on Crites' specific conduct at issue in this case, the Court determines that he was acting as an advocate for the county. Parenthetically, Crites' decision not to file charges rebuts a claim of malice.

Although the record is unclear as to whether Crites conducted any interview of Mr. Marshall, the Court finds this conflict of evidence of little consequence. Some investigative acts may be appropriate for a prosecutor as he or she decides whether to initiate a criminal case. *See Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997) ("Absolute prosecutorial immunity will likewise attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution."); *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir.1995) ("[A]bsolute immunity may attach even to . . . administrative or investigative activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.") (quotations omitted). Discussions with a disinterested witness who has information relevant to a decision whether or not to prosecute are within the traditional role of prosecutor.

Plaintiff further contends that Crites did not post a requisite bond before taking office. According to Plaintiff's argument, Crites therefore vacated his the position of Special Prosecutor, and, as a private person, is entitled to no immunity whatsoever. The Court finds no merit in

-25-

Plaintiff's argument.

Crites was appointed as Special Prosecutor pursuant to Ohio Rev. Code § 305.14:

The court of common pleas, upon the application of the prosecuting attorney and the board of county commissioners, may authorize the board to employ legal counsel to assist the prosecuting attorney, the board, or any other county officer in any matter of public business coming before such board or officer, and in the prosecution or defense of any action or proceeding in which such board or officer is a party or has an interest, in its official capacity.

Although the application for the employment of legal counsel was made pursuant to statute, in particular, Ohio Rev. Code § 305.14, the court has the inherent power to appoint a special prosecuting attorney in the investigation of criminal charges. *State ex rel. Thomas v. Henderson*, 123 Ohio St. 474, 175 N.E. 865 (Ohio 1931). Where the duly-elected prosecutor is unable to carry out his or her prosecutorial duties because, to do so would create a conflict situation, it is in the public interest to appoint a special prosecutor. *State v. Bunyan*, 51 Ohio App. 3d 190, 555 N.E.2d 980 (Ohio Ct. App. 3d Dist. 1988). In this case, the parties do not dispute that the Board of Commissioners and Defendant Felmet, the duly-elected Jefferson County Prosecuting Attorney, submitted a request to the court of common pleas for the appointment of legal counsel.[22] "An attorney appointed pursuant to the inherent power of the court is sometimes referred to as a 'special' prosecuting attorney." *State ex rel. Williams v. Zaleski*, 12 Ohio St. 3d 109, 111-12, 456 N.E.2d 861, 863 (Ohio 1984).

Stern contends that, pursuant to Ohio Rev. Code § 309.03, Defendant Crites was required to file a bond as well in order to have immunity. Section 309.03 provides:

---

[22]     Plaintiff makes much of the fact that Crites was not appointed to "assist" Mr. Felmet, the elected Prosecutor. While this fact is certainly true, the Court notes that Crites was appointed to to assist the Board of Commissioners, which, too, is authorized by the statute.

-26-

> Before entering upon the discharge of his duties, the prosecuting attorney shall give
> a bond, signed by a bonding or surety company approved by the court of common
> pleas or the probate court and authorized to do business in this state, or, at his option,
> signed by two or more freeholders having real estate in the value of double the
> amount of the bond over and above all encumbrances to the state.

Ohio Rev. Code § 309.03. Further, Stern relies on Ohio Rev. Code § 3.30:

> A person elected *or appointed* to an office *who is required by law to give a bond or
> security* previous to the performance of the duties imposed on him by his office, who
> refuses or neglects to give such bond or furnish such security within the time and in
> the manner prescribed by law, and in all respects to qualify himself for the
> performance of such duties, is deemed to have refused to accept the office to which
> he was elected or appointed. Such office shall be considered vacant and shall be filled
> as provided by law

Ohio Rev. Code § 3.30 (emphasis added).

Clearly, the term "prosecuting attorney," as used in Section 309.03 relates to the official *elected* to that office, as defined in Ohio Rev. Code § 309.03, which provides that "[t]here shall be elected quadrennially in each county, a prosecuting attorney, who shall hold his office for four years, beginning on the first Monday of January next after his election."

In *Martin v. Ohio*, the defendant challenged his conviction on the basis that an attorney's appointment to assist a county prosecutor in a murder case was flawed because the assistant attorney failed to post a bond. The Ohio Supreme Court concluded that no requirement existed for that assistant to have filed an oath or bond to perform his duties in that murder trial. 16 Ohio 364, 370 (1847). Crites, as an appointed Special Prosecutor, was not required to post a bond before executing his assignment. Therefore, even though he was appointed, he was not "required by law" to give a bond, as compelled by Section 3.30.

For all of these reasons, the Court concludes that Crites is entitled to absolute prosecutorial immunity. Furthermore, his failure to file a bond following his appointment did not deprive him of

-27-

his office as Special Prosecutor or dispossess him of his defensive immunities. Crites' Motion for Summary Judgment is accordingly **GRANTED**. Plaintiff's Motion for Summary Judgment against Crites for invasion of privacy, malicious prosecution and civil conspiracy is **DENIED**.

### 4. <u>Defendant Felmet</u>

Defendant, Bryan Felmet, defeated Stern for County Prosecutor in the 2000 election. Plaintiff vacated the office of County Prosecutor on December 31, 2000 and retired to Florida in 2001. Felmet sought re-election for the Prosecutor's position in 2004. Plaintiff did not run or otherwise participate in the 2004 Jefferson County Prosecutor's campaign.

### a.) **Prosecutorial Immunity**

For the reasons stated above, with respect to Defendant Crites, Felmet is entitled to absolute prosecutorial immunity as it relates to his actions to appoint a Special Prosecutor. Felmet did not, as Plaintiff suggests, lose his prosecutorial immunity when he made a determination that he had an ethical conflict of interest in investigating the claims against his former political opponent. This decision concerned the administration of criminal justice, which was protected by prosecutorial immunity. *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000). As such, Stern's claims of conspiracy, intentional infliction of emotional distress, abuse of process and malicious prosecution fail to the extent that Stern is claiming that Felmet's involvement in the appointment of a Special Prosecutor injured him.

As to Stern's claims against Felmet that relate to his 2004 campaign against Straus, Felmet is not entitled, and does not seek prosecutorial immunity. In the Court's view, of all of the Counts in his Amended Complaint, only Stern's claims of defamation, infliction of emotional distress and invasion of privacy could possibly relate to Felmet's statements and actions as a candidate in the

-28-

2004 election, and may be construed as unrelated to Felmet's role in appointing a Special Prosecutor.

### b.) Defamation

Stern alleges that Felmet falsely characterized Stern as a "liar" in his campaign literature and in radio advertisements. As such, Stern alleges that Felmet defamed him. Defamation is defined as "the unprivileged publication of a false and defamatory matter about another . . . which tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame or disgrace or affects him adversely in his trade or business." *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App. 3d 345, 353, 609 N.E.2d 216, 222 (Ohio Ct. App. 6ᵗʰ Dist. 1992). A defendant who can prove the truth of the allegedly defamatory statement has an absolute defense. *Shifflet v. Thomson Newspapers (Ohio), Inc.*, 69 Ohio St.2d 179, 183, 431 N.E.2d 1014, 1017 (Ohio 1982).

During his re-election campaign in 2004, Felmet published a brochure regarding his opponent, Thomas R. Straus. The brochure stated in pertinent part: "For twenty years, Tom Straus worked side by side with former prosecutor Stephen Stern. And Straus learned a lot. When he lied to the people of Jefferson County, Tom Straus broke our trust– just like Stephen Stern did." (Depo. Exh. 103.) Stern contends that, by this statement, Felmet is calling him a liar, and thus, Felmet defamed him.[23]

The Court concludes that Felmet has demonstrated the truth of the allegedly defamatory statement. The Ohio Supreme Court declared that Stern had been "lying" to ODC investigators when he falsely denied that any taping was occurring. *Stern*, 103 Ohio St. 3d at 496. Stern

---

[23]     Stern also complains that Felmet is calling him a liar by comparing him with Tom Straus, who was found by the Ohio Election Commission to have lied. (Felmet Depo., at 159.)

maintains that Felmet could not have relied upon the Ohio Supreme Court's decision because the opinion was published only days before the election. The Court does not find this argument persuasive. Notably, the Ohio State Bar Association Ethics Committee announced months before the election its conclusions that Stern had violated had violated DR 1-102(A)(4) (forbidding conduct involving dishonesty, fraud, deceit or misrepresentation).

Moreover, Felmet had personal knowledge of that lie that Stern told to the ODC investigators. While he was County Prosecutor, Stern maintained a recording system in his office. Defendant Felmet found the tape of Stern's meeting with the ODC soon after he took began serving as prosecutor after defeating Stern. Felmet played the tape, and personally heard Stern being asked by the ODC investigators: "Are we being taped?" Felmet heard Stern respond: "No, we are not." (Felmet Depo., p. 137, l. 11-24.) Stern has not denied the statement.

Based on the evidence of record, the Court concludes that Felmet has demonstrated the truth of the alleged defamatory statement, such that Stern's claim of defamation against him fails. Thus Felmet is entitled to summary judgment on this claim, and Plaintiff's motion for summary judgment is accordingly denied.

### c.) Intentional Infliction of Emotional Distress

To recover for a claim of intentional infliction of emotional distress, a plaintiff must prove the following:

1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of Torts 2d (1965), Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature

-30-

that "no reasonable man could be expected to endure it," Restatement of Torts 2d, Section 46, comment j.

*Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98, 103 (Ohio Ct. App. 8th Dist. 1983). Further, as the Ohio Supreme Court has vividly explained, to establish such a claim, an ordinary person who hears the alleged tortious conduct must exclaim, "Outrageous!'" *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983)(quoting Restatement of the Law 2d, Torts (1965), Section 46, cmt. d).

The Court concludes that Stern has failed to establish his claim of intentional infliction of emotional distress against Felmet. Felmet allegedly referred to Stern as a liar. As the Supreme Court of Ohio later found, however, Stern did, in fact, lie to the ODC investigators. This negates any claim of outrageousness. The Court cannot characterize Felmet's conduct as so extreme and outrageous as to go "beyond all possible bounds of decency" and cannot consider it "utterly intolerable in a civilized community." *Pyle*, 11 Ohio App. 3d at 34. Felmet is therefore entitled to summary judgment on this claim.[24]

### c.) **Invasion of Privacy**

Stern contends that his claim of invasion of privacy claim against Felmet is based on putting Stern in a false light. Recently, the Ohio Supreme Court recognized the tort of false-light invasion of privacy:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

---

[24] Stern did not move for summary judgment on this claim.

*Welling v. Weinfeld*, 113 Ohio St. 3d 464, Syllabus, 866 N.E.2d 1051 (Ohio 2007). Initially, to establish a claim of false-light invasion of privacy, Plaintiff must prove that the statements which have attracted publicity are untrue. Stern again contends that Felmet's campaign literature and advertisements that referred to him as a liar, which were distributed throughout the county, form the basis of his false-light invasion of privacy claim. As set forth above, however, Plaintiff cannot overcome the determination that the challenged utterance was true. Felmet's motion for summary judgment on this claim is therefore granted; Plaintiff's motion for summary judgment on his false-light invasion of privacy claim is accordingly denied.

## IV.

For the foregoing reasons, the motion for summary judgment filed on behalf of Defendants Bryan Felmet, Adam Scrurti, Richard Delatore, Thomas Graham, and Michael D. Crites (Doc. #186) is **GRANTED**; and the motion for summary judgment filed on behalf of Plaintiff Stephen Stern (Doc. #204) is **DENIED**. The motion for summary judgment by Defendants Kim Felmet, John Corrigan; the law firm of Rich, Crites, & Dittmer, LLC, Gary Roundtree, and Intellinorth Investigations, Inc. (Doc. #187) is also **DENIED**.

**IT IS SO ORDERED.**

<u>   2 - 11 - 2008   </u>
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

-32-